States against Mojica. Ms. Garst. May it please the Court, my name is Hannah Garst. I represent Benito Mojica. Your Honors, we would like to focus on the sentencing argument first. The District Court clearly erred when it concluded that Mr. Mojica was jointly accountable for 18 kilograms of cocaine. Mr. Mojica specifically objected to the drug quantity because he felt that there was no factual support for this finding in the record. The District Court stated that it based this findings on Gayo, who is Ramirez Padilla, but was referred to as Gayo throughout the trial, that it was based on Gayo's testimony. But as the government admits in its brief, Gayo never testified as far as how much cocaine he obtained during the period that Mr. Mojica obtained during the trial. The District Court said that it was based on Agent Roker's estimation. And as I was preparing for oral argument, I think that that word estimation is not a fair characterization. When you look at the pre-sentence report, the 18.084 kilograms was based on his statement to probation, Agent Roker's statement to probation, that Gayo testified that the drug record establishes that Gayo never testified to anything close to that. What Gayo testified to is that he purchased in kilogram quantities, one, two, or up to three kilogram quantities of cocaine when he ran out. There was no testimony, and the government never listed testimony either at the first trial, which resulted in the mistrial, or the second trial as far as how much Gayo believed he purchased during that period of time that they were using the apartment. Now, if you look at the underlying record as well, you can look at the telephone conversations, the seizure of the drugs, the recovery of the drug proceeds, along with Gayo's testimony, and none of that adds up to the 18-kilogram finding. So we would submit that although the district court found that this was the basis, that they have to support the drug calculation with some sort of evidence, and there's no evidence in the record to support that finding. It is only then that the district court can consider the advisory guidelines and determine the 15-kilogram finding is clear error. Well, the government is relying, as you say, on Gayo's testimony, and they also find all that money, the $114,000 or so that represents something, and the government says even though he doesn't give you the time Correct, but if you look at Gayo's testimony, and he only pled guilty to 50 to 150 kilograms of cocaine over the entire conspiracy, and that was 185 weeks. Grams? I'm sorry, kilograms. 50 to 150 kilograms? That's what he pled guilty to. Sorry. That's okay. He pled guilty to that over the entire conspiracy, and what we're talking about is 18 weeks. And if you look at his testimony, and you look at the telephone calls, it's very clear that for at least three weeks of the 18 weeks, he couldn't obtain any cocaine at all. So even if you looked at the amount that was found in the search, so you have about 100 grams of cocaine and $114,000, based on a $20,000 to $30,000 per kilogram, you only have 4 to 5 kilograms of cocaine. Then if you look at some of the telephone calls, you have a kilogram here or a kilogram there. It still doesn't come close to the 18 kilograms, and although the government is stating that in its brief, I don't see anywhere in the brief itself where you can get to the quantity of the 18 kilograms, or you can even get to the 15 kilogram quantity based on the record that was before the district court. Now, the government relies a lot on this affidavit. They frequently run through the supply in a week. He needs to replenish on a weekly basis, and they give some examples, and that he's obtaining new supplies of cocaine at least seven occasions. And we really just need to be over 15, right? It doesn't matter if it's 15 or it's 18, right? Correct. If it's over 15, it's the same guideline. And if you look at what the government's citing on those seven occasions, there's several of them that fall outside of this period. And again, Guy was having difficulty during the time that they were at the apartment obtaining cocaine and obtaining quality cocaine that he could sell. So we believe that the district court, that this should go back for resentencing. The district court should take a look at the quantity, make a finding as far as what the quantity was during the time that Mr. Mojica was involved in this case, or involved in the conspiracy. Excuse me. As far as the motion to suppress, we believe that the district court erred when it denied the motion to suppress because Mrs. Mojica lacked actual and apparent authority to consent to the search of the detached garage. So the testimony is a little vague, but she certainly goes into the garage some of the time. She goes in to get a soda. There's some indication that when he's at home, sometimes the door is open. So she doesn't seem to have 100% access to it, and he has the only keys. But on the other hand, it seems to me possible to see in this record that she's got some access to it, which could give her at least the apparent authority, if not the actual authority. She's his wife. She lives there too. Correct. Even though there's a presumption that because she's the wife that she has the authority to grant access, if you look at her testimony, she testified that she went into the garage when Mr. Mojica was there and when Mr. Mojica left the door open on the occasion that she went in for a soda a month and a half before the search. They were having a party, and they had left the garage door open because they were running an extension cord from there to run. I'm not sure exactly what they're running, but they were running an extension cord so that door was open, and they had used the fridge in the garage on that day for the purpose of having soda because they were having a party. But agents... But it just goes to show that it's a little bit fluid, right? So she might have the ability to say, you know, if we can get in, go on in. Well, it would be our position that the agents, especially with apparent authority, on that day have to look at whether she has access to mutual use and control over that area of search. What did she tell them at the time? At the time, she told them that she did not have a key. She told them that the workspace was Mr. Mojica's and that she hadn't been out there in a month and a half. Did she tell them she could not enter? The record does not establish that she told them that she could not enter the garage. Unless there's any further questions, I'll... Okay, that's fine. Thank you. Ms. Greenwald. Good afternoon, Your Honors. Good afternoon. Dealing first with the sentencing issue, the district court made a finding. It found that he was responsible for 18 kilograms of cocaine. And so the question is, was that finding clearly erroneous? It wasn't for several reasons. First of all, Gallo testified that he dealt in multi-kilogram quantities. And of particular importance, he testified that during the period that this apartment was used, between May and the end of September, he was doing the higher quantities. He was storing up to three kilograms. He testified that at the beginning of his drug enterprise in 2009, even through 2000, earlier in 2012, he was dealing in single-kilogram quantities. But at the end there, when he was dealing with the defendant and using the defendant's house as his stash house, he was at the higher end of things, up to three kilograms at a pop, two to three kilograms at a pop. And what he said was, basically in his testimony, he doesn't say, I ran out every week, I ran out every seven days, I ran out every nine days. He couldn't do that. This witness could not do that. But what he could do was say, whenever I ran out, I was getting up to three kilograms. I was getting up to two to three, especially at that end. But we do have, I mean, you know, obviously estimates are fine, but they have to be based on reliable evidence. There is this three-week period that he says he's out. And, I mean, it's a big difference. The government really threw the book at him, quantity-wise, you know, in this second proceeding. So, I mean, it would make a big difference what this estimate is. Well, I think what the government did here and what the evidence does here, essentially, and what the FBI agent was essentially saying to the probation officer, is you do look like at averages and you do have to extrapolate. And what the judge was rejecting was he was saying you can't just look at, what the defendant had argued there, was you count up the amount of cocaine actually listed in the complaint or in these telephone conversations during that 18-day period, which came to, like, 2.7 kilograms or something. And the district court said, you cannot do that. You cannot look at just this one mini-vision of this large conspiracy and this large organization that Gayo had. You have to look at that and you have to look at his testimony, which is that I was fine whenever I ran out. I was dealing in multi-kilogram quantities. But these amounts have to be reasonably foreseeable to Mr. Mojica. They do. That's important. Well, Mr. Mojica, in these conversations he was having with Gayo,  I mean, there's no doubt that Mr. Mojica knows he's dealing with a lot of suppliers and he does that. And that was never the argument. The argument was never made that this wasn't foreseeable to Mr. Mojica. The argument made is that there wasn't sufficient evidence to give us an estimation. Was he resupplying every week? Was it every two weeks? And what the government has pointed out, particularly in our brief, was that you can make that extrapolation from both the complaint and these recordings. And you do it by looking at slices, but not saying we're limited to those slices, but saying you can get a reasonable estimation based on those slices. So, for example, the reason why it's relevant to look in the complaint to a period outside this 18-week period is because even though the complaint is looking at dates in 2011 or whatever, you can look at those dates and see. He's running out on a weekly basis. But doesn't the market change from time to time? It can, but also the market time we're looking at now, he's dealing in bigger quantities because his testimony is very clear that in that period I was using the apartment. I was dealing and the worker came there. The government's not saying there's no issue here. We understand that this isn't completely overwhelming evidence here. We're extrapolating from a record. But I don't think the court should be left with what you'd have to be left with to find that this is clearly erroneous, which is a firm conviction that a mistake was made here, that there's enough on this record and through this witness's testimony about dealing with this large-scale operation. And I think it's also supported, Your Honors, by two other things that also bolster this. And I take your point, Judge Woods, that we just have to get to that 15-kilogram threshold. So I think that supports it. But in addition, we do these 18 weeks based on May 20th, exactly May 20th through September 27th. So the date they move the drugs into his apartment to the date it closes. Well, the defendant agrees on May 8th to enter into this stashed conspiracy to hold this. So there's an even wider period. And the indictment charged that this conspiracy charge started well before May 20th, I think even earlier than May 8th. And he knew on May 8th what he was agreeing to. Again, there's been no foreseeability argument here. So the government would argue there's even a few more weeks in there. And in addition, he also, by his own argument here in his brief, the gallow did admit to 50 to 150 kilograms. And if you go to the higher end, which we would argue is supported, that higher end is supported by the fact that he's dealing in greater kilograms towards the end, and particularly during the period relevant here, you're almost at the 15-kilogram quantity amount there. And the fact is there's another 84 grams, you know, I'll let you get into the ammunition that he's actually buying individually, that gets you over the 15 kilograms. So, I mean, I know we're slicing hairs here, but in general, in terms of, I feel like there was no firm mistake here in getting to 18 kilograms. And it seems even safer and more giving advantage to the defendant to say 15 kilograms is very clear here. Given the nature of the testimony in this case, and given the slices we do have that show the regularity of the purchases of cocaine in this case, that we can glimmer from both the affidavit and from the telephone conversations. I don't know if you have any more questions on that particular issue before I move to the search. On the search issue, what I would say, first of all, is that the judge specifically rejected the wife's testimony to the extent she, Mrs. Mojica's testimony, to the extent she was, and found her to be expressly exaggerating as an express finding, to the extent she was saying she never had access to these keys except through her husband. He found the agent's testimony credible, that she had told the agent a week before the suppression hearing when he interviewed her, that her husband often left the keys in their house. And so in terms of just actual authority, not only were there family possessions in that garage, the bikes, the lawnmower, the soda, you know, the refrigerator with the sodas, not only did she, you know, never testify she didn't have, you know, that he ever told, she testified he never told me I could not go in there. She actually said that affirmatively. He never told me I can't go. So, Judge, my recollection as I stand here is yes, that that, that she testified. I think it would have probably been a cross-examination question. That's my best recollection is that, and that's what came out of my mouth I believe, is that my recollection is yes. And then in addition, and if not, she was silent on the point, but she definitely never testified that he told her she could not enter. And moreover, that the court made the finding that she had access to those keys usually. I mean, the main argument against actual authority on appeal has been she didn't have the key that day. That morning he took the key with him when he went to drive his daughter to school. And, you know, as we point out in the brief, who has the key at any given moment in time is really not determinative of this issue. There's a number of factors, and they all, for the reasons we state in our brief, argue toward actual authority. But even if there's not actual authority, apparent authority is really overwhelming here. I believe counsel left out a few additional facts that she told the officer at the time, which was that the wife had been married, that she'd been married to the defendant for 19 years, that she lived in the house with the defendant and their children for over seven years, that she was a co-owner of the property. Now, that's what she told the agent that day. In her testimony, she said she wasn't an owner, she just helped pay the mortgage. But the fact, should I stop or can I continue this thought? Finish your thought. But at the day she said that she was a co-owner of the property. And she said, I rarely went into the garage, and when he asked her when was the last time you did go in there, she said that summer, which would have been, as counsel says, about a month and a half before. And she never told the agent she didn't have permission to go in. So for all these reasons, we'd ask the court to affirm the conviction and sentence. All right. Thank you. Anything further, Ms. Garst? Two quick points on the sentencing. First, as government counsel just stated, if you look at the high end of the 150 kilos and you extrapolate that over the 185 weeks, you still get below the 15 kilograms. So even based on what counsel is saying, adding the .084 kilos, which amounts to 84 grams, in my brief we explained that you're still under that 15-kilogram mark, which would lead him to a lower offense level. Second, as far as the conspiracy starting earlier, the phone call occurred on May 8th, but there was no substantial step, in our opinion, until May 20th when they actually moved in. So we believe that's when the conspiracy would start. Could I just ask what you think is the largest number for quantity that the evidence reasonably supports? I think the largest number of quantity that it would support would be that high end of the 150 kilograms extrapolated over the 185 weeks, which still gets you below. So I think it works out to 14-point-something. 14.4, about. I mean, reasonably a district court could use what he pled guilty to as an estimate and divide it by weeks. We've seen that done in many cases. But in the 5 to 15 range? It would be in the 5 to 15. Okay. Thanks. Thank you very much. Thank you. And you took this by appointment, I believe? Yes, ma'am. And we thank you very much for that as well. Thank you. And thanks to the government. We'll take the case under advisement, and the court will be in recess.